### COMBUSTION UTILITIES CORPORATION et al. v. WORCESTER GASLIGHT CO.

(Circuit Court, D. Massachusetts. August 8, 1911. Defendant's Petition for Rehearing, August 26, 1911.)

#### No. 527.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—PROCESS OF REGULATING TEMPERATURE OF COMBUSTION IN GAS PRODUCERS.

The Doherty patent, No. 829,105, for a process of regulating the temperature of combustion in gas producers by introducing to the grate a mixture in definite proportions of the waste products of combustion, including carbon dioxide, and of air at a designated temperature for the purpose of reducing the temperature of combustion and preventing the formation of clinkers, was not anticipated and discloses invention. Also, *held* infringed as to claims 7, 10, and 13.

2. PATENTS (§ 27*)—VALIDITY—THEORY OF OPERATION.

Whatever may be the correctness of the theory of operation of a patentee if a new application of old means is sufficiently described to enable those skilled in the art to produce a new and useful result, it is enough to sustain the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 31, 32; Dec. Dig. § 27.*]

3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—COMBUSTION REGULATOR FOR FURNACES.

The Doherty patent, No. 844,504, for apparatus for regulating combustion in furnaces, claim 3, is for a true combination, was not anticipated, and discloses invention; also, *held* infringed.

#### Defendant's Petition for Rehearing.

4. PATENTS (§ 315*)—SUIT FOR INFRINGEMENT—REHEARING.

The discovery after final hearing and decision in an infringement suit of another patent claimed to anticipate the one in suit, particularly where it was referred to in defendant's record and brief, is not a sufficient ground for reopening the case.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 315.*]

In Equity. Suit by the Combustion Utilities Corporation and others against the Worcester Gaslight Company. On final hearing. Decree for complainants.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Harold Binney and Odin Roberts, for complainants.

John H. Roney and Macleod, Calver, Copeland & Dike, for defendant.

BROWN, District Judge. The bill charges infringement of two letters patent to Henry L. Doherty; No. 829,105, August 21, 1906, for "process of regulating the temperature of combustion in gas producers," claims 7, 10, and 13; and No. 844,504, February 19, 1907, for "apparatus for regulating combustion in furnaces," claim 3.

[1] The Doherty process of regulating the temperature of combustion has as its object to prevent or minimize the formation of clinkers in the furnace and secure a saving in fuel. The formation of clinkers can be obviated by maintaining the combustion at a temperature lower than that required for the formation of the slag or flux.

Water and steam were used to reduce temperature and minimize the formation of clinkers, but with objectionable features. The Doherty invention does away with the use of steam and water. Instead, he says:

"I introduce into the bed of incandescent carbonaceous fuel a decomposable gas, preferably carbon dioxide ($CO_2$), which may be used either alone or mixed with other gases. * * * I have discovered that the temperature throughout the entire incandescent bed of fuel may be kept down to a point at which clinkering will not occur, by utilizing the heat absorbing effect occurring in the disassociation of the carbon dioxide," etc.

Doherty returns to the grates a part of the waste products of combustion, mixed with air, with the purpose and effect of a regulation of temperature so that slag is not formed.

The claims of the process patent in suit are:

"7. The hereinbefore-described process of making combustible producer gas, which consists in conducting combustion within a deep fuel bed by means of air and carbon dioxide, regulating the proportion between the quantity of air and carbon dioxide introduced into the producer, and regulating the amount of such mixture of air and carbon dioxide so as to avoid objectionable slagging of the fuel and conducting said gas unburned to the point of use."

"10. The herein-described process which consists in making producer gas from a deep bed of fuel with a draft current containing oxygen, nitrogen, and carbon dioxide and proportioning the carbon dioxide with reference to the temperature of the draft and the slagging qualities of the fuel to determine and maintain the temperature equilibrium occurring between the heat produced in the fuel bed by the reaction of the free oxygen and carbon mainly to produce carbon monoxide and the heat absorbed by the endothermic and physical actions at a temperature below the objectionable slagging or clinkering temperature of the fuel."

"13. The herein-described process of regulating and controlling combustion in making producer gas, which consists in conducting combustion of oxygen and carbonaceous fuel mainly to produce carbon monoxide in the presence of carbon dioxide, and in maintaining the temperature equilibrium occurring between the heat-producing and the heat-absorbing actions in the fuel bed at a temperature below the objectionable clinkering temperature of the fuel by introducing to a deep bed of the fuel a draft essentially of air and products of combustion and by so regulating and proportioning the ratio of products of combustion and air with reference to the temperature of the draft and the slagging qualities of the fuel, substantially as described, as to limit the temperature as aforesaid."

The practical success of this process or method and its value in obviating the production of clinkers and in saving fuel is established by convincing testimony.

The defendant, however, sets up anticipation by the prior art, and further contends that, if not fully anticipated, the difference from the prior art is so slight as not to involve the exercise of the inventive faculty. The defendant contends that, as a gas producer is an apparatus in which a combustible gas is generated from the slow and incomplete combustion of carbonaceous fuel, it is the familiar knowledge of the ordinary workman that in operating a gas producer he is not to treat it like a coal stove for the production of heat, with the consequent consumption of coal, but on the other hand is to keep the temperature of his producer as low as is possible, and thus save fuel; or, in other words, treat the producer as a distilling apparatus rather than a stove.

But this in no wise detracts from the novelty of the Doherty process. Though the specification says:

"The formation of clinkers can be obviated by maintaining the combustion at a temperature lower than that required for the formation of the slag or flux"

—this is referred to, not as a discovery, but as knowledge familiar to those in the prior art who employed water and steam to reduce the temperature of the fuel, and thus minimize the formation of clinkers.

The question of the novelty and patentability of the process depends upon the means employed by Doherty to reduce the temperature and the advantage over former means. The defendant contends that the prior art discloses the use of a draft current composed of air and carbon dioxide, i. e., the waste products of combustion, and cites specially in its brief the following patents: British letters patent No. 16,-207, of 1890, to Frederick Siemens; British letters patent No. 4,644, of 1889, to the same inventor; British letters patent No. 20,083, of 1889, to the same inventor; United States letters patent No. 209,554, of 1878, to Eustis; United States letters patent No. 451,612, of 1891, to Biederman & Harvey; United States letters patent No. 442,600, of 1890, to the same inventor; United States letters patent No. 468,-834, of 1892, to Frederick Siemens; United States letters patent No. 468,835, of 1892, to the same inventor; United States letters patent No. 692,257, of 1902, to B. E. Eldred.

The complainant concedes that the use of the products of combustion for the purpose of economy by restoring heat to the fuel bed was well known in the prior art. We may assume for the purposes of this case that it was old to return to the grate carbon dioxide, or the waste products of combustion, for the sake of the heat brought to the fuel bed, and that it was also old to introduce air to the grates together with the heated products of combustion. There is still to be considered the practical difference between heat production and heat regulation.

Heat regulation by draft regulation is, of course, obvious; but Doherty goes beyond this. His process clearly shows the conception of temperature regulation by a definitely regulated mixture of air and

products of combustion admitted to the fuel bed, for the definite purpose of operating a gas producer at a temperature lower than the slagging or fluxing point; or, as Doherty expresses it:

"The invention consists of a process of employing carbon dioxide for regulating the temperature of combustion in a gas producer furnace for heating retort ovens or other purposes."

Assuming that when, in the prior art, waste products were returned to the grate, the carbon dioxide did have the effect of reducing temperature, yet there was, so far as I have been able to learn from the prior patents, no one before Doherty who so employed this temperature-reducing effect of the waste products of combustion, or so regulated the proportion between such products and air, as to maintain a temperature suitable for a gas producer and such as practically obviated the formation of clinkers—a defect which previously was considered unavoidable and put up with as a necessary evil.

It is expressly conceded by defendant's expert that none of the patents of the prior art contains any direct statement regarding slagging or clinkering the fuel. There is no disclosure that anticipates Doher-. ty's statement of what could be accomplished in heat regulation by the means described.

The complainant's propositions that prior to the inventions in suit clinkering was accepted as an unavoidable evil in furnaces and gas producers; that the only means previously employed to mitigate this was water or steam; and that the Doherty process both obviates the use of water or steam and so thoroughly prevents clinkering that the necessity of removing clinkers and of the accompanying chilling of the furnace by the admission of cold air is obviated—require careful attention.

It is true that Mr. George H. Benjamin, defendant's expert, testifies to a series of tests of the Biederman & Harvey construction for the purpose of determining the best temperature to prevent clinkering, and the best proportion of products of combustion and air for various purposes, and that there was no difficulty in operating the Biederman & Harvey furnace without the production of any perceptible amount of clinker. On the other hand, these tests tend to show that what could be accomplished in heat regulation by proper proportions of the products of combustion and of air was not a matter of familiar knowledge and was not obvious at the time of these experiments, which were made in England in 1884. But the defendant has failed to show that these experiments and the knowledge thereby acquired were ever applied to practical use, or became a part of the familiar knowledge of the practical art. As this record stands, Doherty produced a new result in the art, a practical nonclinkering gas producer furnace, and made an important contribution to the art by the disclosure of what could be practically accomplished by a new way of applying old means.

Stated in its simplest aspect, and disregarding the chemical theory of what occurs above the grates of a gas producer, it was the discovery that by introducing to the grate of a gas producer a mixture containing proper proportions of the waste products of combustion (containing carbon dioxide), and of air at a suitable temperature indicated

in his specification, the gas producer could be practically operated in a mannner new to the art and with results of commercial value.

Of claim 7 Mr. Benjamin says:

"This claim states the obvious. It is unreasonable to assume that any furnace manager would operate his producers so that large quantities of slag, objectionable quantities, would be produced."

But the preponderance of evidence is to the effect that furnaces were so operated, and the common use of water and steam is an indication that it was not known that temperature could be controlled and maintained below the slagging point merely by the careful use of the waste products of combustion mixed with air.

It is of course easy to say that the cause of clinkering was well known, i. e., a high temperature; that to reduce the temperature would be obvious; and that to control the supply to the grate of air and waste products of combustion would be an obvious means of reducing the temperature, and thus of preventing clinkering.

The answer to this is that none of the prior patentees cited disclosed this, and that so far as appears none of the many gas producers was so operated as to achieve the result which apparently is well recognized as new and useful in the practical art.

It follows from a view of the prior art that the defendant in operating its gas producer cannot be prevented from using the waste products of combustion for the purpose of restoring heat to the grates, and that the defendant may also introduce air with the products of combustion. As it was old in the art to introduce both air and carbon dioxide, the defendant cannot be held an infringer merely because of its temperature-reducing effect, since such effect was necessarily involved in the operation of furnaces of the prior art fed by air and carbon dioxide.

Where Doherty departs from the prior art, according to my understanding, is in mixing carefully and in carefully determined proportions the products of combustion and air, and in introducing this mixture at a moderate temperature, about 700 degrees Fahrenheit, as indicated by the specification; the heated mixture restoring some heat and thus assisting the generating of carbon monoxide, as in the prior art, but without introducing such an amount of heat as to produce the high temperature at which slagging occurs.

[2] Finding, as we must upon this record, that the effect of operating a gas producer by such a mixture resulted in the maintenance of an even temperature below the clinkering point, and that this was not known to those skilled in the art, the theory of the chemical reactions occurring within the gas producer is of minor consequence. Whatever may be the correctness of the theory of operation if a new application of old means is sufficiently described to enable those skilled in the art to produce a new and useful result, that is enough. Diamond Rubber Co. v. Consolidated Rubber Co., 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527 (Sup. Ct. of U. S. April 10, 1911).

The defendant's superintendent, Mr. Barnum, testifies to the necessity of a very carefully proportioned mixture of the products of combustion and of air, and to the practical improvement of heat regula-

tion thereby. The testimony of this skilled and intelligent witness, however, as to the actual chemical reactions which occur in the defendant's producer, and the apparent divergence of expert opinion as to the chemical changes that occur during combustion, raises doubt whether the Doherty patents can be regarded as presenting either the correct chemical theory of operation or any novelty in the chemical changes above the grates.

To introduce carbon dioxide was not a new conception and as it was well known, as conceded by complainant's expert, Mr. Queneau, that $CO_2$ reduced the temperature, we cannot concede that the conception of using carbon dioxide as a cooling agent is broadly new in the art.

It was doubtless familiar knowledge that carbon dioxide, a noncombustible gas, had chemically a cooling effect and not a temperature raising effect. It is urged by the complainant, however, that in the practice of the prior art it was introduced at so high a temperature as to offset any cooling effect from chemical reaction. Whether this is true with the Biederman & Harvey and Siemens structures and process is not clear upon the patents themselves.

There is, it must be confessed, great force in the defendant's argument that in the operation of any furnace, whether supplied with air alone or with air and the waste products of combustion, temperature regulation is implied, and that when in the prior art the products of combustion were supplied to the furnace they were necessarily accompanied by a regulated proportion of air; in other words, that there was necessarily a regulation of the respective amounts of air and of carbon dioxide in order to produce combustion and to generate carbon monoxide.

It is also apparent that in the operation of such furnaces the reduction of $CO_2$ to $CO$ is endothermic or heat absorbing, and that whether the $CO_2$ was that resulting from combustion in the fuel bed, or that introduced in the draft current, the conversion of carbon dioxide to carbon monoxide was a cooling process.

It is fair to say that it is doubtful if the part of the specification relating to the heat absorption in the reduction of carbon dioxide to carbon monoxide is anything more than the description of chemical reactions that have necessarily occurred with all types of gas producers, whether supplied with a draft of air alone or with both air and carbon dioxide.

That the improvement in the Doherty process consists merely in regulation of temperature through the reduction to $CO$ of that portion of $CO_2$ introduced into the mixture seems impossible to establish as a fact. To single out as the actual and dominant factor in maintaining a low temperature the heat absorption which results from $CO_2$ introduced in the draft current seems to give a fallacious emphasis to a part of what occurs above the grate.

That there is in a fuel bed operated with a Doherty regulator any novel chemical action is not established. The specification was fairly criticised by the examiner in this language:

"Applicant is not the inventor of any exothermic or exothermal or endothermic or endothermal reactions which may take place in the development

or absorption of heat in his process. This is all theory, and the lengthy statements therein are unnecessary to a proper understanding of the present invention."

As is frequently the case when a patentee attempts ex post facto a physical explanation of what he has found by experiment, a collateral issue is raised which diverts attention from what is more important—the means whereby he effects his result.

[3] What we are concerned with is the difference between what Doherty did and what was done by prior inventors. This may be seen by examination of the apparatus patent, No. 844,504, dated February 19, 1907, for "apparatus for regulating combustion in furnaces." Claim 3 is as follows:

"In apparatus of the character described, the combination of a gas producer, a combustion chamber, retorts therein, secondary air flues leading to the combustion chamber, return flues for products of combustion leading from the combustion chamber to the stack and arranged in proximity to the secondary air flues, primary air flues leading underneath the grate, an injector for conducting air and a portion of the products of combustion from the return flues to the grate, and means in addition to the injector for regulating the mixture of air and products of combustion."

The defendant contends that this claim is not for a true combination, but for a mere aggregation of devices; a gas producer and a retort bench which do not co-operate to produce the result of regulating combustion in furnaces.

It is quite true that the gas producer should be considered by itself, and that references in the prior art are equally valuable whether the combustion chambers contain retorts or other articles to be subjected to heat. The retorts wherein is distilled illuminating gas from coal have no function in the production of the gas from the "gas producer." It may be said, however, that the claim is more limited in scope than the invention described. The type of furnace shown, including a gas producer, combustion chamber, retorts therein, secondary air flues leading to the combustion chamber, return flues for products of combustion, primary air flues leading under the grate, is well represented in the prior art, and the invention relates to improvements which in the specification it is said "may be applied either to the form of furnace shown or to any other gas producing furnace, or they may be applied in connection with furnaces for steam boilers."

The fact that the element retorts, referring to the retorts wherein illuminating gas is distilled from coal, is included in the claim, is an insufficient reason for pronouncing the claim invalid as for a mere aggregation. The entire structure of the claim comprehends new elements applied to a structure of an old type. If in this claim the inventor, by including the words "retorts therein," has limited himself to a claim for his invention when applied to use in a structure of special type, it would be a harsh and unusual construction of his claim to say that, because he had unnecessarily limited himself to the use of his invention for the purpose of heating retorts, he should lose it altogether.

It is so generally the practice of patent solicitors to draw claims for an invention as applied to its most important use, and to file com-

bination claims which cover the invention in a special field of application, that the doctrine of "aggregation" should not be applied to defeat this claim merely because it includes a gas producer and a gas bench, with retorts heated by the combustion of gas generated by the producer, as well as Doherty's new regulating means, whereby the producer gas is generated more economically, and thus the illuminating gas is more cheaply generated from the retorts.

The two elements of claim 3 which require special consideration are:

"An injector for conducting air and a portion of the products of combustion from the return flues to the grate."

And:

"Means in addition to the injector for regulating the mixture of air and products of combustion."

Doherty shows in his drawings two forms of injectors and employs the word "injector" in the specification to describe equally an injector nozzle supplied with air or steam from a suitable source and an injector consisting of a power-driven fan. Though the defendant devotes a very considerable part of its brief to insistence that the patentee should be limited to the nozzle form of injector, and though a considerable amount of expert testimony is devoted to that question, I think to so limit it would do violence to the patent as issued; and I find nothing in the file wrapper which in my opinion amounts to a concession by the patentee that he had abandoned the fan injector so carefully described and illustrated. The fan type of injector is the one used by the defendant and the only one which will require consideration.

The fan injector by its motion sucks in the waste gases and also a portion of air which is regulated by a damper. The complainant contends that in view of the prior art nozzle injectors and fan injectors were well-known equivalents, and this seems to me clear. They were both used for producing motion of the waste products of combustion toward the grate.

The ordinary injector of the prior art was a means of conducting the products of combustion, and incidentally perhaps air, to the grate. In the prior art also there were means in addition to the injector for regulating the amount of air introduced with the products of combustion. The British patent to Siemens, No. 16,207, which was cited against the patentee in the Patent Office, has an injector shown by reference to character K, and means in addition to the injector for introducing more or less air in conjunction with the waste products of combustion are shown in a jet K and in doors M, $M^1$, and J.

Letters patent No. 468,834, to Siemens, February 16, 1892, disclosed similar means in addition to the injector. The Biederman & Harvey patents, numbered 442,600 and 451,612, disclose an injector for producing a movement of the waste products of combustion toward the grates, and also show means for introducing under the fuel bed more or less air. It is fundamental in a device of this character that more or less air be fed to the grates or to the fuel bed, and it is evident that devices of the injector type for propelling to the grates the waste

products of combustion would result in some mixing of the products of combustion and air; but the regulating means are rough compared with Doherty's means for close regulation, and indicate no knowledge of the value of more exact regulation.

It must be conceded that the prior art comes very close to the Doherty patent in respect to the general features of operating gas producers. By analysis of the structures of the prior art it is possible to point out one by one elements corresponding to the terms wherein the patentee in his claims has set forth his invention. Nevertheless these elements are not combined in any structure of the prior art as Doherty has combined them in his apparatus.

While the prior art has injectors, and has means other than the injector for introducing air, they are not in the same relation and are not so arranged as to co-operate, as in the Doherty apparatus, for the close regulation of the proportions of the mixture. The importance of this is conceded by Mr. Barnum, defendant's superintendent, who says that he has always operated defendant's structure with the gases thoroughly mixed and diffused.

In this and in the special manner in which the injector and dampers are conjointly used the defendant follows Doherty and not the structures of the prior art.

The defendant's fan injector is accurately described in the language of claim 3 as an injector for conducting air and a portion of the products of combustion to the grate, and it co-operates both with the damper for the admission of air and with the return flues, exactly as the fan injector of the Doherty apparatus patent.

Whether the capacity of the defendant's producer to operate without the production of clinkers is due entirely to the adoption of what was taught by Doherty we need not determine. It is enough that this is of substantial value in assisting to the result. If the use of shaking grates to automatically remove the ash before it is fused to slag is the efficient means of preventing clinkering, the defendant is at liberty to employ this means alone, without infringing the Doherty patents. If it be said that in mixing his waste products and air more thoroughly and in introducing the mixture cooler Doherty merely differed in degree from the practice of the prior art, yet this is a difference which is more than a mere difference in degree, and is brought into the field of invention and of patentability by showing novel and valuable results. Diamond Rubber Co. v. Consolidated Rubber Co., supra.

Though it may have been well known that slag is produced only at a high temperature and can be avoided by a low temperature, apparently it was not known in the practical art how to approach the maximum temperature desirable in gas producers without overstepping the line at which slagging is caused.

A very protracted and careful examination of the record convinces me that Doherty made a meritorious advance in the art; that he was the inventor both of an apparatus and of a new process. While there is much ground for discussion in that part of his specification which relates to the theory of operation, and in his claims, yet it seems reasonably free from doubt that Doherty's apparatus for regulating combustion was a new structure which is not anticipated in the prior art,

and that it embodies the discovery that by a definite control of the mixture of air and waste products of combustion, and by a definite regulation of the temperature of his mixture, he could accomplish a valuable result which could not be accomplished, and had not been accomplished, merely by using the waste products of combustion and air without regard to their exact proportions, the thoroughness of mixture, and the temperature at which the mixture should be introduced. Exact adjustment of these as means to the specific and novel end of maintaining temperature within a maximum limit, for the elimination of the undesirable slag which accompanies the use of the same means not exactly adjusted, and applied without regard to and without attaining this specific improvement, distinguishes Doherty broadly from the prior art.

While the general resemblance of the means of generating producer gas brings the prior art close to Doherty, yet in the specific feature of successfully eliminating the formation of slag while operating a gas producer, which is the subject of his invention, there is, so far as the patents in evidence are concerned, no prior disclosure and no prior art with means, which resemble Doherty's.

The defense of noninfringement before the filing of the bill, based upon the fact that the plant was operated for about two months by the Riter-Conley Manufacturing Company, is, in my opinion, without merit. This operation was conducted in accordance with a contract whereby the defendant procured the Riter-Conley Company to construct the plant and to operate it for the purposes of defendant's business. Under such circumstances the defendant is directly responsible for the infringement.

To consider in detail the criticisms of the claims would uselessly prolong this opinion. Each claim of the process patent is expressly limited by the expression "the hereinbefore-described process," and when read in connection with the specification is intelligible, though claims 10 and 13 of the process patent are not clearly expressed.

I find claims 7, 10, and 13 of the process patent, No. 829,105, valid and infringed.

I find claim 3, of the apparatus patent, No. 844,504, valid and infringed.

A draft decree may be presented accordingly.

Odin Roberts and Harold Binney, for complainants.

Macleod, Calver, Copeland & Dike and Wm. A. Copeland, for Worcester Gaslight Co.

John H. Roney, for other defendants.

## Defendant's Petition for Rehearing.

[4] After filing of an opinion in favor of the complainants, the defendant files a petition asking that the case be reopened in order that it may be permitted to introduce in evidence letters patent to Ellis, No. 790,253; and also for reconsideration of the case in view of proceedings in interference between Doherty, the inventor of the patents in suit, and Ellis, wherein it is claimed that certain concessions of priority were made by Doherty to Ellis. The discovery, after final

hearing and decision, of another United States patent, and particularly the discovery of a patent referred to in defendant's record, and specifically referred to in defendant's brief, is not, under the circumstances, a sufficient justification for reopening the case. In re Gamewell Fire-Alarm Tel. Co., 73 Fed. 908, 20 C. C. A. 111; Kissinger-Ison Co. v. Bradford Belting Co., 123 Fed. 91, 59 C. C. A. 221; Lafferty Mfg. Co. v. Acme Ry. Signal & Mfg. Co., 143 Fed. 321, 74 C. C. A. 521; Boston & R. Electric St. Ry. Co. v. Bemis Car-Box Co., 98 Fed. 121, 38 C. C. A. 661.

Furthermore, the Ellis patent was granted in pursuance of an application of later date than the first Doherty patent, and, as the Doherty inventions are so closely related (see Steinmetz v. Allen, 192 U. S. 543, 559, 561, 24 Sup. Ct. 416, 48 L. Ed. 555), Ellis, upon the showing made by the petition, is later than Doherty. The petition does not indicate that a different result should have followed if the Ellis patent had been before the court at the final hearing. The concessions of Doherty to Ellis and of Ellis to Doherty for the purposes of an interference were upon the record in an exhibit offered by the defendant. It is doubtful if these concessions, made for the purposes of an interference, can create an estoppel upon Doherty as against a defendant who is not in privity with Ellis. As admissions, they have little force, in view of the concessions made by Ellis to Doherty and of the claims allowed to Doherty in interference. The argument that the concessions of Doherty to Ellis are destructive of Doherty's claims to priority seems equally applicable to show the destruction of Ellis' claims to priority by his concessions to Doherty. It is a question whether the mutual concessions are not so inconsistent as to neutralize each other However this may be, the defendant does not make a case which justifies the reopening and continuance of this already protracted litigation. The defendant has chosen the grounds upon which to contest the Doherty patent. This choice has shaped the course of the testimony, and the rule that the party who has his day in court must present his case, and not reserve arguments, then fully available, for use in case he shall not prevail upon his chosen defenses, seems specially applicable to the present petition.

Petition denied.